*Montgomery Park, LLC v. Maryland Department of General Services*, Case Nos.
0035 and 0048, September Term 2021. Opinion by Nazarian, J.

**STATE FINANCE AND PROCUREMENT – MARYLAND STATE BOARD OF
CONTRACT APPEALS – LEGAL STANDARD FOR CANCELLATION OF A
PROCUREMENT**

The correct standard of review when reviewing a procurement agency's decision to cancel
a procurement is whether the decision was unreasonable, arbitrary, and capricious. The
Maryland State Board of Contract Appeals reviews a procurement officer's decision
against this standard and may not substitute its judgment for the procurement officer's.

**STATE FINANCE AND PROCUREMENT – BID PROTESTS – STANDING**

Under COMAR 21.10.02.02, only interested parties may file bid protests. A party is not an
interested party, and thus lacks standing, when it is not in line for award of a sole source
procurement. When a party is not an actual or prospective bidder, a procurement agency
may deny the party's bid protest on standing grounds.

Circuit Court for Baltimore City
Case Nos. 24C20000887 & 24C20001565

_____

MONTGOMERY PARK, LLC,

v.

MARYLAND DEPARTMENT OF GENERAL
SERVICES

_____

Fader, C.J.,
Berger,
Nazarian,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  February 23, 2022

* Judge Kevin F. Arthur did not participate in the Court's decision to designate this opinion for publication in the Maryland Appellate Reports pursuant to Maryland Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This pair of appeals arises from decisions of the Maryland State Board of Contract Appeals ("Board") to sustain two bid protests filed by Montgomery Park, LLC. *First*, Montgomery Park protested the Maryland Department of General Services's ("DGS") decision to cancel a Request for Proposal ("RFP") for office space, that DGS had issued on behalf of the Maryland Insurance Administration ("MIA"). Montgomery Park was the recommended awardee of the MIA lease, but DGS cancelled the RFP before presenting it to the Board of Public Works ("BPW") for approval. The DGS procurement officer denied Montgomery Park's bid protest and Montgomery Park appealed to the Board.

*Second*, Montgomery Park protested DGS's decision to renew MIA's lease with St. Paul Plaza Office Tower, LLC ("St. Paul Plaza") on a sole-source basis. The DGS procurement officer denied this protest as well and Montgomery Park appealed to the Board again.

The Board sustained both bid protests and DGS sought judicial review in the Circuit Court for Baltimore City. Montgomery Park appeals both decisions of the circuit court, which reversed the judgments of the Board and reinstated the DGS procurement officer's original decisions. For the reasons set forth below, we affirm the judgments of the circuit court.

## I.     BACKGROUND

### A. Regulatory And Statutory Background.

We start with an overview of Maryland procurement law. "The State Finance and Procurement Article of the Maryland Code," specifically Title 13, "and its regulations," Title 21 of the Code of Maryland Regulations ("COMAR"), "govern the solicitation and

award of certain state contracts for the purchase of" real property. *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 503 (2014). Title 21 of COMAR "contains the regulations that govern" Title 13 of the State Finance and Procurement Article. *Department of Pub. Safety & Corr. Servs. v. ARA Health Servs., Inc.*, 107 Md. App. 445, 460 (1995). Under COMAR 21.03.04.01, "[e]ach determination required by the State Finance and Procurement Article" or Title 21 of COMAR must be written and "[b]ased on written findings of, and signed by, the person who made the determination."

After a bid is opened but before the award, a procurement officer may "cancel an invitation for bids, a request for proposal, or other solicitation" if the officer determines that cancellation "is fiscally advantageous or otherwise in the best interests of the State." Md. Code (1988, 2021 Repl. Vol.), § 13-206(b)(1) of the State Finance & Procurement Article ("SF"); *see also* COMAR 21.06.02.02C(1) ("After opening of bid proposals but before award, all bids or proposals may be rejected in whole or in part when the procurement agency . . . determines that this action is fiscally advantageous or otherwise in the State's best interest."). Further, a procurement officer who "determines that renewal of an existing lease is in the best interests of the State . . . may negotiate the renewal without soliciting other offers." SF § 13-105(g); *see also* COMAR 21.05.05.02D ("When it is determined to be in the best interests of the State, the procurement officer may negotiate the renewal of an existing real property lease without soliciting other proposals.").

Interested parties, defined as "an actual or prospective bidder, offeror, or contractor that may be aggrieved by the solicitation or award of a contract," may file a bid protest. COMAR 21.10.02.01B(1). A bid protest is "a complaint relating to the solicitation or award

2

of a procurement contract." COMAR 21.10.02.01B(2). Bid protests must "be filed not later than 7 days after the basis for the protest is known or should have been known, whichever is earlier." COMAR 21.10.02.03B. "Protestors are required to seek resolution of their complaints initially with the procurement agency." COMAR 21.10.02.10A. If the protestor is unsatisfied with the procurement agency's determination, they may appeal to the Board under COMAR 21.10.07.02.

The Maryland Administrative Procedure Act ("APA"), as codified in the State Government Article ("SG") (1984, 2021 Repl. Vol.), governs judicial review of final administrative agency decisions, including the Board's, in contested cases. Section 10-222(h) provides the circuit court with authority to review and either remand, affirm, or reverse agency decisions:

> (1) remand the case for further proceedings;
>
> (2) affirm the final decision; or
>
> (3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:
>
>> (i) is unconstitutional;
>>
>> (ii) exceeds the statutory authority or jurisdiction of the final decision maker;
>>
>> (iii) results from an unlawful procedure;
>>
>> (iv) is affected by any other error of law;
>>
>> (v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted;
>>
>> (vi) in a case involving termination of employment or employee discipline, fails to reasonably state the basis for the termination or the nature and extent of the penalty or sanction imposed by the agency; or

(vii) is arbitrary or capricious.

Parties aggrieved by the final judgment of the circuit court may appeal to this Court. SG § 10-223(b)(1).

### B. The Requests For Proposal And Procurement Process.

On April 1, 2008, MIA entered into a lease agreement with St. Paul Plaza, located at 200 St. Paul Place in Baltimore City. St. Paul Plaza is owned and managed by the Kornblatt Company. The lease between MIA and St. Paul Plaza was set to expire on May 3, 2019, subject to a five-year renewal option and a six-month holdover period. In August 2017, based on concerns about parking options for its employees, MIA asked DGS to issue a RFP for new office space.[1] On behalf of MIA, DGS issued RFP No. LA-01-18, which solicited offers for new office space, on August 21, 2017.

On September 19, 2017, Montgomery Park, located at 1800 Washington Boulevard in Baltimore City, submitted its proposal and offered to lease office space to MIA. Eleven other buildings, including St. Paul Plaza, also submitted proposals for the new office space. On May 4, 2018, DGS Procurement Officer ("PO") Wendy Scott-Napier selected Montgomery Park for award of the MIA lease. Ms. Scott-Napier listed the proposals in ranked order, and Montgomery Park came in first place with a score of 229.4 while St. Paul Plaza came in second with a score of 204.0.

DGS and Montgomery Park then entered an eleven-month period of negotiations

---

[1] DGS is a "primary procurement unit" with the authority to designate procurement officers to "(1) enter into a procurement contract; (2) administer a procurement contract; or (3) make determinations and findings with respect to a procurement contract" on behalf of the State. SF § 11-101(m)(2), (p)(1)–(3).

over the MIA lease. In June 2018, DGS prepared a briefing summary that detailed reasons for selecting Montgomery Park for the MIA lease. The summary noted that "[b]y moving MIA to Montgomery Park, the State would save $337,705.27 annually and $3,337,052.70 over the full 10-year lease term, after factoring in the agency's moving costs and a moving allowance provided by the landlord." DGS also chose Montgomery Park over St. Paul Plaza because "[c]urrently . . . not all MIA employees have access to free parking. Montgomery Park operates a surface parking lot where all MIA employees would have access to free parking."

DGS, MIA, and Montgomery Park met in November 2018 to discuss the logistics of a move to Montgomery Park. At this time, DGS also provided Montgomery Park a draft lease. Montgomery Park left that meeting "with an understanding that the lease was to be presented to the Board of Public Works in January 2019."

On December 18, 2018, Ms. Scott-Napier notified Kornblatt representative Tim Polanowski by email that DGS would not be exercising the five-year renewal option with St. Paul Plaza, but asked for a one-year extension "in the event the move [to Montgomery Park] is delayed." Mr. Polanowski rejected this request as "unworkable for [St. Paul Plaza]," but offered to negotiate a multi-year renewal. On January 3, 2019, Ms. Scott-Napier emailed Mr. Polanowski requesting "a renewal of the lease on behalf of MIA for a shorter period of time" than five years. This conversation continued on February 7, 2019, when Ms. Scott-Napier discussed the lease extension with Mr. Polanowski and "requested either a 3 year short term lease with [termination for convenience] or a 3 month hold-over extension[.]" But as of March 11, 2019, Mr. Polanowski had not responded to Ms. Scott-

5

Napier's request for a short-term extension because the trustees of St. Paul Plaza wanted to meet with her. Meanwhile, on March 12, 2019, DGS informed Montgomery Park the MIA lease would be presented to the BPW for approval on April 24, 2019.

On March 29, 2019, Ms. Scott-Napier and another DGS representative met with Mr. Polanowski and two St. Paul Plaza trustees to discuss the MIA lease. There were no notes of this meeting, but on April 9, 2019, Mr. Polanowski emailed Ms. Scott-Napier his understanding of the outcome:

> I just wanted to send a reminder that in our meeting on March 29th, we determined a [Letter of Intent] with **fully negotiated terms** agreed upon by both parties would be delivered no later than April 24th or we would have to unfortunately continue negotiations with other tenants to fill the MIA space . . . .

(Emphasis in original.)

Ms. Scott-Napier, however, had a different understanding of the meeting:

> [COUNSEL FOR MONTGOMERY PARK]: Did the Kornblatt Company ask DGS to renew its lease at the March 29th meeting?
>
> [MS. SCOTT-NAPIER]: They asked, and we told them we could not discuss the lease renewal at that meeting. That we were there only to discuss a short-term extension or hold-over extension.

Ms. Scott-Napier also disagreed with Mr. Polanowski's characterization of the meeting:

> [COUNSEL FOR MONTGOMERY PARK]: Mr. Polanowski reminded you that in that March 29th meeting it was determined that a Letter of Intent with, quote, fully negotiated terms agreed upon by DGS and the owners of 200 St. Paul would be delivered to the owners of 200 St. Paul by April, 24, 2019, correct?
>
> [MS. SCOTT-NAPIER]: That is what he wrote. I did not agree to that. I did not agree to that because we did not discuss terms. All I stated in our March 29th meeting was that we would know

6

by April 24th whether we were moving to Montgomery Park. Because that was the Board of Public Work's [sic] day, and we would have sought approval for the lease.

On April 12, 2019, however, Ms. Scott-Napier responded to Mr. Polanowski's April 9, 2019 email, stating "[w]e understand the timing request and hope to get back to you by 4/22 at the latest."

## C. Cancellation Of The RFP.

On April 19, 2019, Ms. Scott-Napier sent an email to MIA Commissioner Al Redmer and DGS to inform them about the lease renegotiation with St. Paul Plaza:

> Just wanted to confirm that DGS will begin the lease renegotiation process next week. We are currently in the lease hold-over period through November 2, 2019, and there is no issue with your occupancy until that date. I am confident that we will complete the lease renewal process and seek BPW approval for a renewal lease no later than September 4th.

On April 23, 2019, the day before the lease between Montgomery Park and MIA was to be submitted to the BPW for approval, Commissioner Redmer sent a letter to DGS asking it to cancel the procurement of the MIA lease. Commissioner Redmer provided four reasons to cancel the MIA lease with Montgomery Park:

> 1. **The initial justification for the Request for Space has changed and is no longer valid.** . . . Once [Montgomery Park] was identified as the intended awardee, it became clear that improved parking options were less critical to staff than access to multiple modes of public transportation; approximately 60% of MIA employees use public transportation to commute to and from work. [Montgomery Park] is not directly accessible by multiple city bus routes, regional commuter buses, Metro and Light Rail. Lack of direct access to [Montgomery Park] will require employees to board a private 15-person shuttle that runs between the Convention Center and [Montgomery Park] during limited

7

morning and evening hours. Members of the general public will not have access to this private shuttle . . . .

2. **Employee retention will be significantly adversely impacted.** . . . The MIA anticipates that its relocation to [Montgomery Park] will result in the departure of experienced regulatory staff with the specialized insurance-related knowledge and expertise needed to perform its regulatory functions. An increase in employee turnover and the time and expense to recruit and train new staff will be particularly detrimental to the MIA's operations . . . .

3. **Interruption of MIA operations and regulations of Maryland's insurance industry will hurt Maryland consumers and businesses.**

   The moving cost estimate did not consider the interruption to regulatory operations during the relocation period which is projected to last several weeks. . . .

4. **Insurance companies doing business in Maryland have opposed the move on the basis that it will be the second time in 10 years that these companies must fund the MIA's relocation.**

   Among other regulated entities, several large insurance companies, one a Maryland domestic company, have complained that the relocation of the agency twice in 10 years is a wasteful expenditure of their funds. The moving cost estimate did not consider that the relocation would increase the cost of doing business in Maryland. Should a company leave the state, this will not only hurt consumers of insurance, but will reduce jobs, and reduce the premium tax revenue.

(Emphasis in original.) Commissioner Redmer concluded it was "in the best interest of the State to cancel this procurement."

That same day, Ms. Scott-Napier sent a letter to Montgomery Park cancelling the RFP. The letter did not state a reason for cancelling the procurement, writing only that "[a]t the request of [MIA], [DGS] is cancelling RFP # LA-01-18." It did, however, attach Commissioner Redmer's April 23 letter to DGS detailing the reasons why MIA wanted to

cancel the procurement. Ms. Scott-Napier then prepared a Procurement Officer's Written Determination, pursuant to COMAR 21.05.03.01, again summarizing Commissioner Redmer's April 23 letter. She concluded "[b]ased on the rationale presented, I find that this RFP is no longer in the State's best interest and recommend approval of the MIA request."

On April 25, 2019, Ms. Scott-Napier sent a letter to Mr. Polanowski, cc'ing Commissioner Redmer, stating that DGS "would like to begin discussions on the [MIA] lease" with St. Paul Plaza. The BPW approved DGS's request to renew MIA's lease with St. Paul Plaza on January 8, 2020.

### D. The Bid Protests.

#### 1. *The first bid protest*

On April 30, 2019, Montgomery Park protested ("First Protest") Ms. Scott-Napier's decision to cancel the procurement. It contended that "DGS's decision to cancel the RFP was arbitrary and capricious, lacked a rational basis, and was otherwise unreasonable." *First*, Montgomery Park asserted that the cancellation notice violated COMAR 21.03.04.01 and 21.06.02.02 because there was "no 'determination' made by DGS that cancellation 'is fiscally advantageous or otherwise in the State's best interest,' nor are there reasons offered by DGS why cancellation is necessary." *Second*, Montgomery Park argued that the reasons offered by Commissioner Redmer in his April 23 letter did not "provide DGS with a rational basis to support its decision to cancel the RFP." *Third*, Montgomery Park contended that MIA's reasons for cancellation were "pretextual" and meant "to prevent the State of Maryland from entering into a lease agreement with anyone *other than* St. Paul Plaza." (Emphasis in original.)

9

On June 20, 2019, Ms. Scott-Napier, in her capacity as procurement officer, issued a final decision letter denying Montgomery Park's First Protest. She detailed that "[a]fter a careful and detailed consideration of all of the factors . . . I determined that [] the solicitation was no longer justified, and that cancellation of the RFP was fiscally advantageous and in the best interest of the State." Ms. Scott-Napier rejected Montgomery Park's contention that the cancellation notice violated COMAR because the "absence of a continued need for the procurement is, in and of itself, a sufficient reason for canceling the RFP." Ms. Scott-Napier also found that DGS had a rational basis for canceling the RFP:

> DGS did not enter into this procurement with the intent of cancelling it. During the negotiation period after the recommended award to Montgomery Park, it became clear that the parking accommodation issue was minor in comparison to other issues arising from the relocation . . . . In addition, for a number of other reasons . . . MIA concluded that the move would negatively impact its employees, visitors, the insurance companies that provide its funding, and ultimately, Maryland taxpayers and the business community. *DGS evaluated the concerns raised by MIA and reached the same conclusion.* Ultimately, DGS determined that the relocation could not be justified financially and was not in the best interest of the State. Once DGS made this determination, it had the absolute right under COMAR and DGS's Standard Specifications to cancel the RFP and negotiate the renewal of MIA's lease with 200 St. Paul Place.

(Emphasis added.) On July 1, 2019, Montgomery Park appealed DGS's denial of the First Protest to the Board.

10

## 2. The second bid protest[2]

On September 27, 2019, Montgomery Park filed another bid protest ("Second Protest"), this time challenging DGS's decision to renew MIA's lease with St. Paul Plaza and citing three errors. *First*, Montgomery Park argued DGS violated COMAR because Ms. Scott-Napier negotiated the MIA lease with St. Paul Plaza without determining, in writing, that renewal was in the best interest of the State:

> COMAR 21.05.05.02D required DGS and/or the procurement officer to make a written "determination" that it was in the State's best interest to negotiate the terms of the Renewal Lease. No such "determination" was made, and therefore the ensuing negotiations are *ultra vires* and will result in a void contract.

Montgomery Park asserted it was not aware of the absence of this written determination until September 23, 2019. It contended that it didn't receive the April 25, 2019 letter from Ms. Scott-Napier to Mr. Polanowski discussing renewal of the MIA lease until September 18, 2019, during the discovery phase of the First Protest appeal. In response, on September 19, 2019, Montgomery Park submitted a request under the Maryland Public Information Act seeking:

> The written "determination" in accordance with COMAR 21.05.05.02D that it was in the best interests of the State of Maryland to negotiate the renewal of the real property lease agreement between (i) St. Paul Plaza Office Tower, LLC, and (ii) the State of Maryland, to the use of the Maryland Insurance Administration.

---

[2] Montgomery Park filed another bid protest on August 23, 2019, about a month before it filed the protest that we have labeled the Second Protest. This bid protest was denied as untimely. Montgomery Park did not appeal this decision to the Board.

11

On September 23, 2019, DGS informed Montgomery Park there were "no records within [DGS's] custody and control responsive to your request." Therefore, Montgomery Park asserted, the timeliness requirement that "protests shall be filed not later than 7 days after the basis for protest is known or should have been known, whichever is earlier," was met because only four days elapsed between September 23 and September 27.

*Second*, Montgomery Park "preemptively challenge[d] any finding [] that it was in the State's best interest to negotiate the Renewal Lease . . . ." It enumerated specific reasons why it was not in the State's best interests for DGS to renew the MIA lease with St. Paul Plaza, including that the renewal lease was "prohibitively expensive." *Third*, Montgomery Park asserted that it had standing to challenge the proposed renewal award because "it was aggrieved by DGS's unauthorized negotiations with St. Paul Plaza, and will be aggrieved by the award of the Renewal Lease which will effectively prevent Montgomery Park from entering into a real property lease with the State for use by MIA for at least 10 years . . . ."

Ms. Scott-Napier denied the Second Protest on October 15, 2019 as untimely. She found that Montgomery Park knew well before September 23, 2019 that DGS was renegotiating the MIA lease with St. Paul Plaza. And because "Montgomery Park was aware on July 23, 2019, at the latest," of the renewal lease, the Second Protest, filed on September 27, 2019, was untimely. Ms. Scott-Napier also found that Montgomery Park did not have standing to protest the renewal of the MIA lease because it was not an interested party and was not in line for a renewal lease. In addition, she found that the Second Protest had "no merit as DGS's determination that it was in the best interests of the State to negotiate a renewal lease with St. Paul Plaza was entirely consistent with

12

COMAR." On October 24, 2019, Montgomery Park appealed DGS's denial of the Second Protest to the Board.

### E. The Board's Rulings.

#### 1. The Board's first ruling

On October 23, 2019, the Board held a merits hearing on the appeal of the First Protest. The standard of review was a prominent issue throughout the hearing. Montgomery Park urged the Board to "render a decision that the decision to cancel the procurement in April 2019 was arbitrary and capricious, and that there was no rational basis to support the decision," while DGS asked the Board to consider "whether the decision to cancel that procurement, which is within the discretion of the procurement officer for DGS, was so arbitrary as to be fraudulent or a breach of the public trust."

At the hearing, Ms. Scott-Napier testified she canceled the RFP because she determined that it was in the State's best interests to do so. She testified that she knew of MIA's concerns about moving to Montgomery Park before the April 23, 2019 cancellation, and noted that "when we met in February we were reviewing the moving costs to address their concerns, but we were still working toward seeking approval for the Montgomery Park lease." She asked Commissioner Redmer to put MIA's concerns in writing. Ms. Scott-Napier reviewed that writing (Commissioner Redmer's April 23 letter) and considered MIA's reasons "to be legitimate because of the conversations that I had had with MIA," and "[b]ecause I'm hearing it directly from Al Redmer, and I take it seriously." Ms. Scott-Napier acknowledged she did not state her reasons for cancelling the RFP specifically in her letter to Montgomery Park, but reasoned she failed to do so because "I felt it had been

stated in the Redmer letter" that was attached to her cancellation letter.

Commissioner Redmer also testified at the merits hearing. He acknowledged that "[o]nce Montgomery Park was announced as the awardee of the RFP, there was instant heartburn" among MIA employees who protested the move. Commissioner Redmer testified that over a period of time, he became concerned about the move to Montgomery Park:

> Well, there was certainly a cumulative effect. So while I'm hearing heartburn from all of these internal and external forces, while we're hearing the heartburn, we're working on a daily basis, my Deputy, in preparing for a move. . . .
>
> As we rounded the end of 2018, I had growing concern about the items that I mentioned and the risk of not having a home. You know, the lease expires May 1 of 2019. We had an automatic extension of six months until November 1st, what? Two weeks from now. You know, as we got into the spring of 2019, you can't move 250 people in 4 or 5 or 6 months. You just can't do it.
>
> So when you look at the fact that we didn't have a lease, I have a lease that's expiring with 250 people that I need to have desks for. That, in addition to all of the other heartburn is what raised my temperature.

He communicated these concerns to DGS in his April 23 letter, noting "the issue of parking no longer outweighed everything else."

The Board issued its opinion ("First Opinion") on January 29, 2020. Before addressing the merits, the Board dedicated almost twelve pages to analyzing the standard of review, explaining that its intent was to clarify the "muddled" state of Board opinions on the issue:

> [W]hen dealing with bid protests relating to cancellations of solicitations, the Board has been less than clear about the

standard of review it applies . . . . Because the Board's case law in cancellation cases is muddled with inconsistent and seemingly contradictory opinions, this Board begins its review and analysis of this issue with the case most often cited, [*Hanna v. Board of Education of Wicomico County*, 200 Md. 49 (1952)], in support of what [DGS] argues is the "higher" and correct standard of review (*i.e.*, "fraudulent and so arbitrary as to constitute a breach of trust").

The Board ultimately rejected DGS's contention that the standard of review in cancellation decisions is the "higher" fraudulent intent standard from *Hanna*:

In light of the policy and principle that cancellations of solicitations in Maryland are strongly disfavored, the standard of review prescribed by the APA for courts reviewing administrative decisions in contested cases, and the firmly established procurement law in federal courts regarding the standard of review when evaluating cancellation decisions, *we believe that scrutiny of the decision to cancel should not be focused on whether the decision to cancel was made with fraudulent intent or whether it was so arbitrary that it would constitute a breach of trust, but should instead be on whether the procurement officer abused her discretion to such an extent that her decision was unreasonable, did not have a rational basis, or was not sufficiently supported by evidence.*

(Emphasis added.) The Board noted that its core standard of review for all bid protests, including cancellation of solicitations, is an arbitrary and capricious standard: "a procurement officer's decision will be overturned only if it is shown by a preponderance of the evidence that the agency action was biased, or that the action was arbitrary, capricious, unreasonable, or in violation of law."

On the merits, the Board concluded that the process leading to Ms. Scott-Napier's decision to cancel the procurement was flawed:

In this case, it is clear from the evidence presented, both in documentary form and from witness testimony, that the

reasons stated in support of the PO's determination that it was in the best interest of the State to cancel the solicitation were, in fact, the four reasons asserted by Mr. Redmer for why Mr. Redmer believed it was in the State's best interest to cancel. The PO wholly adopted Mr. Redmer's reasons as her own, admittedly without undertaking any significant independent investigation to confirm that the facts stated by Mr. Redmer in support of his reasons were accurate. In short, the process by which she made her determination was flawed.

The Board addressed each issue identified in Ms. Scott-Napier's Procurement Officer's Written Determination, "which were derived from Mr. Redmer's April 23, 2019 letter . . . ." For each issue, the Board cited decisions from the United States Court of Federal Claims to support its conclusions. *First*, the Board cited merits hearing testimony to support its conclusion that Ms. Scott-Napier failed to consider, "in the larger context of the Procurement Law," whether the initial justification for the procurement had indeed changed and was no longer valid. Instead of verifying independently or taking "any affirmative steps to ascertain the accuracy of Mr. Redmer's assertion[s]," the Board said, Ms. Scott-Napier adopted this first reason as her own:

> The PO testified that although she was aware that Mr. Brooks had discussions with Montgomery Park during the negotiation period about the shuttle service and various modes of accessing public transportation, she did not participate in these discussions and had no first-hand knowledge regarding any of the specifics that were discussed. She did not verify Mr. Redmer's assertion that Montgomery Park "is not directly accessible by multiple city bus routes . . . ." She did not verify that there was a "[l]ack of direct access to the Property[.]"

> The PO did not verify Mr. Redmer's assertion that 60% of the MIA employees use public transportation to commute to/from work, and she did not take any affirmative steps to ascertain the accuracy of Mr. Redmer's assertion that members of the general public will not have access to the private shuttle, an assertion that was inaccurate.

16

Furthermore, other than Mr. Redmer's testimony, no credible evidence was admitted to support the assertion that the employees' transportation and parking needs had indeed changed after it was announced that Montgomery Park had been selected for award. Yet the PO adopted this reason for cancellation as her own without undertaking any significant actions to obtain and examine the "relevant data" to verify that such changes had occurred.

*Second*, the Board found that Ms. Scott-Napier likewise failed to verify Commissioner Redmer's contention that employee retention would be impaired by the move to Montgomery Park:

[T]he PO again took no affirmative steps to obtain and "examine the relevant data" to verify Mr. Redmer's assertion. . . . The PO simply relied on her own "knowledge as a manager and knowing the difficulties we have" as her justification for wholly accepting Mr. Redmer's assertion that he would lose staff with specialized knowledge of the insurance industry. . . . She acknowledged that she accepted Mr. Redmer's assertion "at face value" and "did not investigate further."

\* \* \*

While Mr. Redmer may perceive the move to Montgomery Park to be a significant impact on the retention of his employees, it was the PO's responsibility to determine, based on credible evidence, whether the asserted impact was merely Mr. Redmer's perception, or whether it was real and, if real, whether and to what extent the impact on MIA was more significant than the impact upon any other agency undergoing a move . . . .

*Third*, based on her testimony, the Board found Ms. Scott-Napier could not reasonably have concluded that cancelling the procurement was in the best interests of the State after she failed to confirm independently that MIA's move to Montgomery Park would hurt Maryland consumers and businesses:

17

She did not investigate the accuracy of Mr. Redmer's assertion that the "moving cost estimate did not consider the interruption to regulatory operations during the relocation period which is projected to last several weeks." It is unclear to the Board how a moving cost estimate could take into consideration an intangible such as "the interruption to regulatory operations during the relocation period," but it is clear that the PO did not attempt to investigate this either.

*Fourth*, "and most illuminating, is the PO's lack of knowledge that the MIA is fully funded by the insurance companies that it regulates and the impact this newly acquired knowledge," that "insurance companies would be required to pay the moving costs," had on her decision to cancel the procurement. The Board found it "surprising" that Ms. Scott-Napier "did not become aware of this information until she received Mr. Redmer's letter on April 23, 2019, and then cancelled the solicitation the same day." The Board was not persuaded by Ms. Scott-Napier's testimony about this "determining factor":

> Notably, the PO testified that "the determining factor" in her decision to cancel the solicitation was that the insurance companies would be required to pay the moving costs up front via a special assessment spread out over market share. Yet nowhere in Written Determination #2 does the PO identify this as a basis for her determination. If, indeed, the special assessment for moving costs was the determining factor in her decision, it should have been expressly stated in Written Determination #2.
>
> Even more surprising is the PO's failure to take any affirmative steps to verify any of this newly-acquired information before abruptly determining (on the same day that she was advised of information that she says was the determining factor in her decision) that it was in the State's best interest to cancel the solicitation. She did not read any letters from any insurance companies prior to making this determination—she merely verified that these letters were "in hand." She did not ask and did not know who the letters were from, how many letters there were, or what information was contained therein. Again, she did not "examine the relevant data" to support these assertions.

18

[] Instead, she relied solely on Mr. Redmer's assertion that "several large insurance companies" had complained that the move was a wasteful expenditure of their funds since it was the second move in ten years.

Because she failed to investigate or verify the extent of Commissioner Redmer's claims in his April 23 letter to DGS, the Board declined to find Ms. Scott-Napier could reasonably have concluded that cancelling the solicitation was in the best of interests of the State.[3] And as such, the Board found, Ms. Scott-Napier's decision to cancel the procurement was unreasonable, arbitrary, and capricious:

> In this case, the PO's abrupt determination that it was in the State's best interest to cancel the solicitation was, in effect, made by the head of the using agency, the MIA, rather than the PO and the procuring agency, DGS. The process by which the PO made her determination was flawed: she adopted virtually whole cloth the head of the using agency's reasons for wanting to cancel the procurement without verifying the facts supporting his assertions and exercising her independent judgment based on those verified facts. The stated concerns may well have been legitimate and factually based, but it was incumbent upon the PO to investigate and determine whether the facts adequately support those concerns and to weigh all the advantages and disadvantages to the State of cancelling this solicitation before making a determination that cancelling the solicitation was in the State's best interest.

The Board sustained Montgomery Park's First Protest appeal.

### 2. *The Board's second ruling*

The Board held a merits hearing on the Second Protest on February 3, 2020 and

---

[3] Because the Board concluded that Ms. Scott-Napier's determination to cancel the procurement was unreasonable, arbitrary, and capricious, it did not address Montgomery Park's third ground for the First Protest, that DGS's reasons for the cancellation were pretextual.

issued its opinion ("Second Opinion") on February 28, 2020. The Board began by finding Montgomery Park an "interested party" with standing, within the meaning of COMAR, to challenge DGS's decision to enter into a sole-source renewal lease with St. Paul Plaza. The Board rejected DGS's argument that the First Protest and Second Protest were separate proceedings for standing purposes because Mr. Scott-Napier's "determination that it was in the best interest of the State to proceed with the instant sole-source procurement arises and flows from the wrongful cancellation of the prior competitive procurement." Because Montgomery Park was "the recommended awardee of the prior competitive procurement that was cancelled in violation of the Procurement Law," and because Montgomery Park was "'aggrieved by' the wrongful cancellation," the Board found that it qualified as an interested party.

The Board also found Montgomery Park's Second Protest timely. The Board considered when Montgomery Park "knew or should have known that the PO failed to make a written determination in violation of SF&P §13-105(g) and COMAR 21.05.05.02D" and not when Montgomery Park "knew or should have known that [DGS] was proceeding with a sole-source rather than a competitive procurement . . . ." The Board concluded that Montgomery Park didn't know that Ms. Scott-Napier had "failed to prepare a written determination setting forth her reasons for determining that it was in the State's best interest to conduct a sole-source procurement and award the MIA lease for St. Paul Place to Kornblatt, rather than a competitive procurement for a new lease" until September 23, 2019, and Montgomery Park filed the Second Protest within seven days of that date.

Then, turning to the merits, the Board held Ms. Scott-Napier violated the

20

Procurement Law by failing to document separately her reasons for determining that it was in the State's best interests to renew the lease with St. Paul Plaza. And because she failed to make a written determination, the Board was "unable to evaluate whether her reasons were unreasonable, arbitrary, capricious, or unlawful." The Board sustained Montgomery Park's Second Protest.

### F. Judicial Review In The Circuit Court.

On February 13, 2020 and March 13, 2020, DGS requested judicial review of the Board's First and Second Opinions, respectively, in the Circuit Court for Baltimore City. The judicial review hearing was held on January 20, 2021 and the court issued two memorandum opinions on February 8, 2021. With regard to the Board's First Opinion, the court held that the Board had applied the wrong standard in reviewing DGS's decision:

> The Board concluded that DGS's decisions that it was in the best interests of the State to cancel the procurement "was unreasonable, arbitrary, and capricious." [] In reaching its conclusion, the Board overturned decades of precedent and rejected application of a heightened deference standard to procurement cancellation decisions.

The court found *Hanna*, 200 Md. 49, instructive, noting that although it was a taxpayer standing case, "it stands for the proposition that there are circumstances where courts will not interfere with the exercise of discretion of an administrative agency acting within its authority unless such exercise is fraudulent or corrupt or such abuse of discretion as to amount to breach of trust." Because the Board departed from this standard of review, "it acted arbitrarily and capriciously."

With regard to the Board's Second Opinion, the court found that Montgomery Park

21

"knew of the basis for its protest no later than August 23, 2019 . . . ." As such, the court found that the Second Protest was untimely and the Board had lacked jurisdiction to hear the appeal. The court reversed the Board's decisions, and Montgomery Park filed timely appeals from both.

## II.       DISCUSSION

Montgomery Park and DGS raise numerous questions on appeal[4] that we have

[4] Montgomery Park phrased the Questions Presented as follows:

1. Did the MSBCA apply the proper legal standard in reviewing Appellee's decision to cancel the procurement?

2. Are the MSBCA's findings of fact and conclusions of law set forth in its 50-page opinion supported by substantial evidence and unaffected by error of law?

3. Does the record contain sufficient evidence to support the MSBCA's findings and conclusions that Appellant (a) had standing to protest, and (b) filed a timely protest?

4. Did the MSBCA correctly interpret SFP § 13-105(g) and COMAR 21.05.05.02 to require that Appellee provide a written justification before awarding a sole source contract?

DGS phrased the Questions Presented as follows:

1. Did the Board err when it departed from its precedents applying a deferential standard of review to procurement-cancellations and instead crafted a new requirement that a Procurement Officer thoroughly investigate an agency's reasons for not wanting to move forward with the procurement?

2. Did the Board exceed its statutory authority by closely scrutinizing the process by which the Procurement Officer determined to cancel the solicitation and by substituting its judgment about what is in the State's best interest?

3. In the absence of substantial record evidence that the agency's reasons for abandoning the procurement were not legitimate, did the Board err by shifting the burden of proof to DGS to demonstrate that the determination to cancel the

22

rephrased and condensed into two. *First*, in its First Opinion, did the Board apply the correct legal standard in reviewing DGS's decision to cancel the procurement with Montgomery Park? *Second*, was the Board correct in finding Montgomery Park had standing to file the Second Protest?[5] We hold that the Board stated the legal standard essentially correctly in the First Opinion, but applied it incorrectly, and that Montgomery Park lacked standing to bring the Second Protest.

The Board is an administrative agency whose decisions are subject to the same standard of judicial review as other agencies. *See CSX Transp., Inc., v. Mass Transit Admin.*, 111 Md. App. 634, 639 (1996). In reviewing an administrative agency's decision, "we 'must look past the circuit court's decision to review the agency's decision.'"

_____

procurement was supported by data acceptable to the Board?

4. Did the Board err in concluding that Montgomery Park's protest of DGS's lease renewal was timely filed when it was filed more than two months after Montgomery Park was notified that DGS had decided to negotiate the renewal of MIA's existing lease?

5. Did the Board err in determining that the Procurement Officer was required to issue a written determination prior to renewing MIA's lease, when the regulation that governs lease renewals does not require a written determination?

6. Did the Board err when it determined that Montgomery Park had standing to protest the lease renewal when Montgomery Park was not a party to the existing lease and the renewal did not involve a competitive procurement?

[5] Because we hold that Montgomery Park lacked standing, we need not address the timeliness of the Second Protest or the merits of whether the Board was correct in concluding that DGS violated State procurement law by failing to make a written determination that renewing the lease with St. Paul Plaza was in the best interests of the State.

*Montgomery Cnty. Pub. Sch. v. Donlon*, 233 Md. App. 646, 658 (2017) (*quoting Sizemore v. Town of Chesapeake Beach*, 225 Md. App. 631, 647 (2015)). We "ordinarily give considerable weight to the administrative agency's interpretation and application of the statute that the agency administers." *Montgomery v. E. Corr. Inst.*, 377 Md. 615, 625 (2003) (*citing Lussier v. Md. Racing Comm'n*, 343 Md. 681, 696–97 (1996)).

We are "'limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.'" *Id.* (*quoting United Parcel v. People's Couns.*, 336 Md. 569, 577 (1994)). "Under the substantial evidence standard, a reviewing court must uphold an agency's determination if it is rationally supported by the evidence in the record, even if the reviewing court, left to its own judgment, might have reached a different result." *Travers v. Balt. Police Dep't*, 115 Md. App. 395, 419 (1997) (*citing Dep't of Econ. & Emp. Dev. v. Lilley*, 106 Md. App. 744, 754 (1995)). Thus we affirm agency decisions "'if, after reviewing the evidence in a light most favorable to the agency, we find a reasoning mind reasonably could have reached the factual conclusion the agency reached.'" *Geier v. Md. State Bd. of Physicians*, 223 Md. App. 404, 430 (2015) (*quoting Miller v. City of Annapolis Hist. Pres. Comm'n*, 200 Md. App. 612, 632 (2011)).

Conclusions of law, however, "are subject to more plenary review by the courts." *Maryland Off. of People's Couns. v. Maryland Pub. Serv. Comm'n*, 226 Md. App. 483, 501 (2016). We review the Board's conclusions of law *de novo*. *Schwartz v. Md. Dep't of Nat. Res.*, 385 Md. 534, 554 (2005). So "'where an administrative agency renders a

decision based on an error of law, we owe the agency's decision no deference.'"

*Brandywine Senior Living at Potomac LLC v. Paul*, 237 Md. App. 195, 211 (2018) (cleaned up).

### A. The Board Stated The Correct Legal Standard For Cancellation Protests, But Erred When It Applied It.

*First*, Montgomery Park argues the Board correctly applied the unreasonable, arbitrary, and capricious standard in determining whether DGS's decision to cancel the procurement was in the best interests of the State. DGS contends the Board erred "when it ignored its own precedent and crafted a new standard of review," and asserts that DGS's "decision may only be disturbed upon a finding that it 'was not in the best interest of the state to such an extent that it was fraudulent or so arbitrary as to constitute a breach of trust.'" Neither party hits the nail exactly on the head. Although the Board was correct in characterizing the standard of review in cancellation protests as whether the procurement officer's decision was unreasonable, arbitrary, and capricious, it erred in its application of this standard to Ms. Scott-Napier's decision to cancel the procurement.

> *1. The core standard of review when reviewing a procurement agency's decision to cancel a procurement is whether the decision was unreasonable, arbitrary, and capricious.*

Before a procurement officer may cancel a bid or RFP, they must first "determine[] that it is fiscally advantageous or otherwise in the best interests of the State" to do so. SF § 13-206(b)(1)–(2). The issue before us is what standard of review the Board should employ in reviewing whether a procurement officer's reasons for cancelling a bid reflected the best interests of the State. The Board doesn't conduct a *de novo* review or substitute its

members' judgments for those of the procurement officer—like an appellate court, the Board reviews the officer's decision against a standard that reflects the officer's role and expertise. The dispute here revolves initially around the level of deference the Board owes to the officer's decision, and how to articulate that level of deference. And once the standard is set, we look at whether the Board applied it properly.

The Board's core conclusion—that the base standard for reviewing procurement officers' cancellation decisions is whether the officer's reasons for canceling were unreasonable, arbitrary, and capricious—was fundamentally correct.[6] As the Board stated, "arbitrary and capricious" is the baseline standard for reviewing decisions of administrative agencies. But we disagree with the Board, however, that the core arbitrary and capricious standard and the "fraudulently or so arbitrarily as to constitute a breach of trust" language from *Hanna v. Board of Education of Wicomico County*, 200 Md. 49 (1952), utilized in earlier Board decisions represent categorically different standards. We read these as differing in degree rather than kind, and the latter as articulating the sort of conduct that would demonstrate arbitrary or capricious decision-making in the context of a cancellation.

In *Hanna*, the Court of Appeals reaffirmed earlier decisions establishing the standard of review for courts of equity reviewing administrative agency decisions. The

---

[6] Since the First Opinion, the Board twice has had the opportunity to consider bid protest appeals of procurement cancellations. In both instances, the Board cited the First Opinion, stating "[a] procurement officer's decision will be overturned only if it is shown by a preponderance of the evidence that the agency action was biased, or that the action was arbitrary, capricious, unreasonable, or in violation of law." *MGT Consulting Grp., LLC*, MSBCA No. 3148 at 9 (2020). *See also Medical Trans. Mgmt., Inc.*, MSBCA No. 3151 at 1 (2020).

Court phrased the standard in terms of arbitrariness to a degree reflecting fraud or a breach of trust:

> On a suit by a taxpayer, a court of equity will not review the exercise of discretion of an administrative agency, if it acts within the scope of its authority, unless its power is fraudulently or corruptly exercised; but the court will restrain an agency from entering into or performing a void or *ultra vires* contract or from acting *fraudulently or so arbitrarily as to constitute a breach of trust*.

200 Md. at 51 (emphasis added). There isn't a huge body of cancellation cases in the Board's jurisprudence, but as it noted in its opinion, the Board has cited and applied *Hanna* regularly in those cases. In *Automated Health Systems,* for example, the Board described its scope of review as so narrow that an agency's decision to cancel a bid or RFP could be disturbed only "upon finding that the decision was not in the best interest of the State to such an extent that it was fraudulent or so arbitrary as to constitute a breach of trust." MSBCA No. 1263 at 12–13 (1985); *see also Megaco, Inc.*, MSBCA No. 1924 at 5 (1995). In *Kennedy Personnel Services*, the Board quoted *Automated Health Systems* to "recognize[] the discretion vested in State agencies," but ultimately found that the agency's determination "has a rational basis and is neither arbitrary nor capricious." MSBCA No. 2425 at 5, 6–7 (2004). In *TekXtreme, Inc.*, the Board referenced *Automated Health Systems* and *Kennedy Personnel Services* as recognizing the Board's standard of review as "fraudulent or so arbitrary as to constitute a breach of trust," but then denied the appeal on the ground that the agency had a rational basis for its determination. MSBCA No. 2451 at 4 (2005). Similarly, in *STG, International,* the Board noted "the burden of proof for an appellant to overturn the State's justification for such a [cancellation] decision is extremely

high," and quoted *Automated Health Systems* and *Hanna* to support that proposition. MSBCA No. 2755 at 7 (2011). The Board applied that standard and concluded that "prior decisions of the Board as well as appellate authority support the legal conclusion that cancellation of a solicitation after bid opening may be so arbitrary as to be unlawful." *Id.* Then, in *Hunt Reporting Co.*, the Board dropped the "fraudulent or so arbitrary as to constitute a breach of trust" language altogether and denied the appeal because "the action of the agency's procurement officials w[as] not arbitrary, capricious, unreasonable, or in violation of law." MSBCA No. 2783 at 1 (2012).

As the Board worked through these prior opinions, it recognized that over the years it "continued to struggle with establishing and applying the standard of review in cancellation cases." We agree with its observations that the various articulations of the standard in cancellation cases seem out of sync with its general standard of review bid protests, and that *Hanna*'s reference to fraud suggested a standard higher than the core administrative law standard of arbitrary and capricious review. It made sense for the Board to (re-)calibrate the standard in cancellation cases to track the standard of review for bid protest cases generally. And the Board's articulation here of the overall standard—"a procurement officer's decision will be overturned only if it is shown by a preponderance of the evidence that the agency action was biased, or that the action was arbitrary, capricious, unreasonable, or in violation of the law"—nevertheless is consistent with the principles underlying *Hanna* and the Board cases following it.

The bottom line is that it takes a lot for the Board to reject a procurement officer's decision. And it should: the Board shouldn't substitute its judgment for the procurement

officer's and generally should find itself deferring to the officer's decision, even if reasonable people could disagree on the merits. That said, DGS's contention that the Board "ignored its own precedent and crafted a new standard of review" overstates the impact of the Board's restatement of the standard: the fraud notion in *Hanna* was never meant to replace arbitrariness or capriciousness, but to demonstrate the extent of deviation from reason necessary to justify finding a procurement officer's cancellation decision arbitrary and capricious. Therefore, we hold the Board was correct in deciding that the standard of review to be applied in cancellation decision is whether the procurement officer's decision was unreasonable, arbitrary, and capricious.[7]

> 2. *The Board erred in shifting the burden of proof to the procurement officer.*

Notwithstanding our general agreement with the Board's view of the standard it articulated in this case, we disagree with the Board's application of that standard to the record in this case. Under the guise of reviewing the procurement officer's decision, the Board shifted to DGS a burden it doesn't have: a burden to investigate independently Commissioner Redmer's four reasons for wanting to cancel the procurement. Administrative agencies "have no powers beyond those that have been conferred upon them by statute." *Brzowski v. Md. Home Improvement Comm'n*, 114 Md. App. 615, 626

---

[7] On August 31, 2021, Montgomery Park filed a motion seeking to strike citations to circuit court opinions from DGS's brief. DGS cited two circuit court opinions to support its position that the correct standard of review in cancellation protests is the "fraudulent or so arbitrary as to constitute a breach of trust." Circuit court opinions aren't prohibited strictly by Maryland Rule 1-104, which prohibits citation to unreported opinions of this Court or the Court of Appeals, so we deny the motion. Even so, Montgomery Park is correct that those opinions lack any precedential value in this case, and we haven't relied on them in our analysis here.

(1997). "[T]he power delegated to an administrative agency to make rules is not the power to make laws." *Sullivan v. Bd. of License Comm'rs for Prince George's Cnty.*, 293 Md. 113, 124 (1982). And by requiring DGS to prove that Ms. Scott-Napier's decision to cancel the procurement wasn't arbitrary and capricious, rather than requiring Montgomery Park to prove that it was, the Board exceeded the scope of its delegated powers.

There is no language in any statute, regulation, Board decision, or case imposing a requirement on DGS and Ms. Scott-Napier to investigate and verify Commissioner Redmer's four reasons in favor of cancelling the RFP with Montgomery Park independently. Indeed, by the Board's own reckoning, in bid protests the "Appellant bears the burden of proof" because they are "the party seeking to disturb the Procurement Officer's decision to resolicit" or cancel. *Stronghold Sec., Inc.*, MSBCA No. 2499 at 11 (2005). It fell to Montgomery Park to provide evidence demonstrating that Ms. Scott-Napier's cancellation of the RFP was arbitrary and capricious. Instead, the Board found that Ms. Scott-Napier had an independent duty to investigate and verify Commissioner Redmer's four reasons for wanting to cancel the procurement.

The Board acknowledged "[t]he stated concerns may well have been legitimate and factually based," but ultimately found Ms. Scott-Napier's cancellation decision "unreasonable, arbitrary, and capricious." The Board's reasoning that Ms. Scott-Napier was required to conduct a "significant independent investigation to confirm that the facts stated by Mr. Redmer in support his reasons were accurate" is unfounded. That premise has no basis in law.

To the contrary, the record supports the conclusion that Ms. Scott-Napier did

exercise her discretion and judgment in determining Commissioner Redmer's four reasons were legitimate. She testified before the Board that she cancelled the RFP because the Insurance Commissioner had articulated reasons why cancellation was in the best interests of the State and she agreed with those reasons:

> [COUNSEL FOR DGS]: So based on your review of that [April 23] letter, and your discussions with MIA during this April 18 to 23rd timeframe, what was your determination?
>
> [MS. SCOTT-NAPIER]: That we should cancel the RFP.
>
> [COUNSEL FOR DGS]: And did you conclude that it was in the best interest of the State and fiscally advantageous to cancel that procurement?
>
> [MS. SCOTT-NAPIER]: I did. That was in my written procurement officer's determination that was in our file. Not specifically stated in my letter, but I felt it had been stated in the Redmer letter.

This is all that was required of Ms. Scott-Napier. She was not required, as the Board found, to conduct an independent investigation into whether Commissioner Redmer's four reasons were accurate. Indeed, the Board's own decisions support the principle that Ms. Scott-Napier acted within her broad discretion in cancelling the procurement with Montgomery Park:

> [S]tatutory procurement authority makes clear that, based only upon whatever may be deemed to be "in the best interest of the State," any RFP may be cancelled or all proposals rejected. The State is simply not obligated to finalize a procurement and award a contract just because an RFP has been issued. . . . Moreover, the State's freedom to cancel a procurement at any time is so broad that even after issuing a fully executed award, the government may unilaterally terminate a contract merely on the basis of its own convenience.

*Baltimore City Ent. Grp., LP*, MSBCA No. 2690 at 41 (2010).

31

The Board erred when it "engaged in a detailed explanation of what, in its view, the Procurement Officer should have done to evaluate whether a relocation to Montgomery Park was in the best interest of the State." We agree with DGS that "[n]othing in the RFP or COMAR required" Ms. Scott-Napier "to demand from Commissioner Redmer supporting data, detailed analyses, or employee surveys to justify his decision to retract his request to procure new office space." The procurement officer relied on the rationale articulated by the head of the tenant agency, who is closer to its needs and concerns than the Board is, and Montgomery Park offered no evidence or testimony that undermined Commissioner Redmer's reasons for requesting the cancellation or the procurement officer's decision to rely on them. The Board committed legal error in shifting the burden to Ms. Scott-Napier to prove that her reasons for cancelling the procurement with Montgomery Park weren't unreasonable, arbitrary, and capricious, and we agree with the circuit court that the Board's decision to sustain the First Bid Protest must be reversed.

**B. Montgomery Park Lacked Standing To File Its Second Bid Protest.**

*Second*, Montgomery Park contends it had standing to file the Second Protest, which was directed at DGS's renewal of the MIA lease with St. Paul Plaza. Under COMAR 21.10.02.02, only interested parties may file bid protests. An "interested party" is defined as "an actual or prospective bidder, offeror, or contractor that may be aggrieved by the solicitation or award of a contract, or by the protest." COMAR 21.10.02.01B(1). The Board found Montgomery Park to be an interested party with standing to file the Second Protest because it was aggrieved by the sole-source procurement between MIA and St. Paul Plaza:

> [DGS] would have this Board ignore the facts and surrounding

32

circumstances of the prior competitive procurement of a new MIA lease . . . as well as our previous decision in [First Protest] that the solicitation relating to the competitive procurement of a new MIA lease was wrongfully cancelled by the PO. However, that we cannot do. The PO's determination that it was in the best interest of the State to proceed with the instant sole-source procurement arises and flows from the wrongful cancellation of the prior competitive procurement. Had the solicitation in the prior competitive procurement never been cancelled, then [Montgomery Park] would likely have been awarded the MIA lease, and the PO's decision to proceed with this sole-source procurement would not have occurred. In other words, but for the cancellation of the prior solicitation (now determined to have been in violation of the Procurement Law), this sole-source procurement would not have occurred, and [Montgomery Park] would have had a substantial chance of being awarded the MIA lease.

\* \* \*

We believe that [Montgomery Park], as the recommended awardee of the prior competitive procurement that was cancelled in violation of the Procurement Law, falls squarely within the definition of an interested party under COMAR. [Montgomery Park] is an "interested party" because it was an "actual…offeror" of the prior competitive procurements for a new MIA lease. [Montgomery Park] is "aggrieved by" the wrongful cancellation of the "the solicitation," and [] is also "aggrieved by" the subsequent sole-source "solicitation" because, but for the wrongful cancellation of the prior competitive procurement, the sole-source procurement would not have occurred and [Montgomery Park] would have likely been awarded the MIA lease.

We disagree with the Board's analysis and interpretation. *First*, the First Protest and the Second Protest are factually and legally distinct events and must be considered independently. Although the timeline supports the Board's assertion that the sole-source procurement "arises and flows" from DGS's decision to cancel the RFP with Montgomery Park, that logical and temporal connection doesn't give Montgomery Park a legal interest

33

in the sole source renewal lease.

*Second*, and relatedly, in order to qualify as an interested party and thus to have standing, one must be "in line for award." *Branch Off. Supply*, MSBCA No. 2372 at 4 (2003); *see also DESCO Assocs.*, MSBCA No. 2680 at 2 (2010); *Devaney & Assocs., Inc.*, MSBCA No. 2477 at 9 (2005); *James F. Knott Constr. Co., Inc.*, MSBCA No. 2437 at 3 (2004). "It is well settled by the Board that a protestor is not an interested party 'where it cannot establish that even if the protest were sustained it would be in line for award.'" *DESCO Assocs.*, MSBCA No. 2680 at 2 (*quoting James F. Knott Constr. Co.*, MSBCA No. 2437 at 6).

In denying the Second Protest on standing grounds, Ms. Scott-Napier reasoned that "[b]ecause Montgomery Park is not the holder of the existing real property lease, even if the protest were to be sustained, Montgomery Park would not be in line for a lease renewal under COMAR 21.05.05.02(D), the COMAR provision permitting DGS to renew the current lease for office space for MIA." The Board disagreed, finding that "[b]ecause of the wrongful cancellation of the prior competitive procurement in which [Montgomery Park] was the proposed awardee, [Montgomery Park] has a unique status in relation to this sole source procurement."

We disagree. When Ms. Scott-Napier cancelled the RFP with Montgomery Park on April 23, 2019, the cancellation severed the relationships among Montgomery Park, DGS, and MIA for procurement purposes. Montgomery Park was no longer an actual or prospective bidder or offeror—it stood "in the same position as every office building that is not St. Paul Plaza: it is not the holder of the existing lease, it has not suffered any damage,

34

and it is not in line for the award." Montgomery Park asserts it "is a qualified, prospective offeror with a substantial chance of being selected in a competitive procurement for the proposed award under protest." But this was not a competitive procurement, there was no competitive bidding process, and Montgomery Park was never in line for the renewal lease between DGS and St. Paul Plaza.

*Third*, Montgomery Park's argument fails to recognize the distinction between a regular sole-source, non-competitive procurement and a sole-source renewal procurement under SF § 13-105(g). Citing *AGS Genasys Corp.*, MSBCA No. 1326 (1987), Montgomery Park claims that it may protest the sole-source procurement between DGS and St. Paul Plaza. But *AGS* concerned a bid protest over the awarding of a contract for goods. The Board concluded there that "noncompetitive procurement is justified only where it is established that there is a critical need on a public exigency or emergency basis, not whether it is merely impractical and inconvenient to engage in a competitive procurement." *Id.* at 5. And the renewal of an existing lease of real property is not equivalent to a noncompetitive procurement of goods. Indeed, the exception for a sole-source renewal of real property is codified within the subtitle of the Source Selection title of SF, "*Competitive Sealed Proposal Procedures; Real Property.*" (Emphasis added). Whether or not Montgomery Park is right about procurements for goods, "[i]f a procurement officer determines that renewal of an existing lease is in the best interests of the State, the procurement officer may negotiate the renewal without soliciting other offers." SF § 13-105(g). In other words, DGS was not required to engage in a competitive bid process before renewing the lease with St. Paul Plaza because this situation fell within the statutory

35

exception.[8]

Accordingly, Montgomery Park lacked standing to file its Second Protest, and we agree with the circuit court that the Board's finding that Montgomery Park was an interested party in the renewal lease between MIA and St. Paul Plaza must be reversed.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. APPELLANT TO PAY COSTS.**

---

[8] Again, we do not reach the merits of whether SF § 13-105(g) requires this determination to be in writing.